NOTICE

Decision filed 02/11/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230155-U

NO. 5-23-0155

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 10-CF-459 |
| | ) | |
| TORVELLE L. STANLEY, | ) | Honorable |
| | ) | Stephen R. Green, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the dismissal of defendant's postconviction claims, where he cannot demonstrate prejudice to support a claim of ineffective assistance of counsel, and the trial record positively rebuts defendant's claim of actual innocence based on new evidence.

¶ 2    Following a stipulated bench trial in the circuit court of Williamson County, defendant, Torvelle L. Stanley, was convicted of first degree murder (720 ILCS 5/9-1(a)(3) (West 2012)) and sentenced to 50 years in prison. Defendant appeals the dismissal of his postconviction petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2020)), alleging actual innocence based upon new evidence and ineffective assistance of counsel. For the following reasons, we affirm.

1

¶ 3                                    I. Background

¶ 4     We limit our recitation to those facts relevant to our disposition of this appeal. We recite additional facts in the analysis section as necessary to address defendant's specific arguments.

¶ 5     On November 12, 2010, the State charged defendant by information with first degree murder, alleging that defendant, without lawful justification, while attempting to commit the forcible felony of armed robbery on or about November 11, 2010, shot the victim, Jamel E. Davis, in the chest with a firearm, thereby causing the victim's death. Following defendant's arrest on March 2, 2011, in East St. Louis, Illinois, law enforcement conducted four separate interviews of defendant regarding the Williamson County murder and another murder that occurred in East St. Louis.

¶ 6     Detectives Orlando Ward and Michael Foley of the East St. Louis Police Department and Sergeant Kevin McAleenan of the Illinois State Police conducted the first interrogation of defendant. Shortly into the interview, defendant stated, "I am done answering questions." The questioning continued, and a short time later, defendant again stated, "I'm done talking to you all." The officers continued the interview, and defendant continued answering questions.

¶ 7     On March 3, 2011, Detective Ward and Sergeant McAleenan conducted a second interview of defendant. Defendant requested a "lie detector" test. Another officer performed a voice stress test asking defendant about the East St. Louis murder. The officer informed defendant that he "didn't do so well." Defendant asked to take another test, insisting he was not present during the East St. Louis murder. Detective Ward and Sergeant McAleenan continued questioning defendant after the voice stress test.

¶ 8     Approximately 10 minutes after the second interview concluded, Detectives Bruce Graul and Scott Stefan of the Herrin Police Department, in Williamson County, entered the room to

conduct a third interview of defendant. The detectives read *Miranda* warnings and defendant signed a form indicating his understanding. The detectives then proceeded to question defendant concerning the Williamson County murder. The detectives interrupted defendant's first rendition of events, stating that they believed he was lying. Defendant then asked what evidence they had against him. Upon hearing that the detectives had already interviewed multiple witnesses, defendant shook Detective Graul's hand, stating that he would be honest with them because the detectives were treating him with respect. Defendant confessed to the crime, admitting that, while participating in an armed robbery, he and the victim got into a physical struggle over defendant's gun. Defendant maintained that he did not intend to kill the victim but ultimately shot the victim in the chest during the struggle. Later that day, Detective Ward and Sergeant McAleenan conducted a fourth interview of defendant. Sergeant McAleenan told defendant that he knew defendant had been "straight" with Detectives Graul and Stefan.

¶ 9     On August 29, 2012, defense counsel filed a second amended motion to suppress defendant's statements made during the four interviews, arguing that defendant unambiguously asserted his right to remain silent, but Detectives Ward and Foley, and Sergeant McAleenan failed to scrupulously honor his assertion. On August 31, 2012, the trial court held a hearing on defendant's motion to suppress. At the hearing, the State sought to admit the third interview, stating, "Obviously the third interview is the most important one."

¶ 10     On October 11, 2012, the trial court entered a written order suppressing the first, second, and fourth interviews conducted by Detective Ward and Sergeant McAleenan because "they did not scrupulously honor [defendant's] assertion of his right to remain silent when [defendant] told the police officers that he was 'done answering questions' and 'done talking.' " However, the court denied defendant's request to suppress the third interview conducted by Detectives Graul and

3

Stefan. Specifically, the court found that the detectives preceded the interview with fresh *Miranda* warnings, discussed only the Williamson County murder (the other three interviews discussed the East St. Louis murder), and the "audio-video recording of the third interview clearly shows that no coercive or improper actions were employed by [these] detectives." The court denied defendant motion to suppress the third interview because the detectives "scrupulously honored" defendant's right to remain silent.

¶ 11    On February 15, 2013, defendant's case proceeded to a stipulated bench trial. Defense counsel orally moved the trial court to reconsider the denial of the motion to suppress the third interview. The court denied defense counsel's motion, and the bench trial proceeded. The parties stipulated to the evidence presented. The State then read into the record a written stipulation of defendant's statements from the third interview, as well as eyewitness accounts from Demetrius Moore, Rochelle Richardson, Onlee Muleya, Veronica Woolfork, and Dr. John Heidingsfelder, the forensic pathologist who conducted the victim's autopsy. The stipulated evidence is as follows.

¶ 12    According to the statement of Demetrius Moore, a man named Tommy Hampton picked him and Travius Tucker up at a motel in Belleville, Illinois. Sometime later, all three men picked up defendant. Eventually, Moore drove the vehicle because Hampton became intoxicated. The four decided to drive to Carbondale, Illinois, around 10 p.m. or 11 p.m. Hampton and Tucker discussed "hitting a lick," which, according to Moore, meant to commit a robbery. During the drive to Carbondale and the discussion of "hitting a lick," defendant remained quiet. Tucker, who lived with Onlee Muleya for several weeks in Herrin, Illinois, stated that Muleya had drug money at the apartment. Hampton directed Moore to drive to an apartment in Carbondale to retrieve weapons. Hampton then went inside and returned to the car with two handguns. He handed the guns to Tucker and defendant. Tucker then called Muleya and told him he needed to come to Muleya's

4

apartment later that night to retrieve his clothing. Moore drove to Muleya's apartment. Once they arrived, Tucker and defendant left the vehicle. Moore and Hampton stayed in the car and did not enter the apartment. Several minutes later, Tucker and defendant came running back to the car. Defendant stated, "I think I shot a dude, and he wasn't moving. I shot him in the chest." Moore drove the vehicle back to East St. Louis.

¶ 13    According to the statement of Rochelle Richardson, she lived with Muleya, Veronica Woolfork, and the victim when Tucker called at 1:19 a.m. and said he was coming to retrieve clothing. Richardson let Tucker and an "unidentified black male" into the apartment. Shortly after entering, Tucker and the other male brandished firearms. Tucker asked Muleya several times about money in the apartment. At various times, Tucker and the "unidentified black male" pointed their handguns at her and Muleya. Richardson heard Tucker's handgun " 'click, click, click,' " but the gun did not fire. She retreated to a bedroom and heard fighting inside the apartment. Richardson then heard one gunshot fired in the apartment. She emerged from the bedroom and observed Muleya holding his head and the victim lying and bleeding in the hallway between the two upstairs apartments. Tucker and the "unidentified black male" fled out of the apartment. Richardson identified Tucker in a photo lineup but did not identify the second black male.

¶ 14    According to the statement of Muleya, he, Veronica Woolfork, Richardson, and the victim were in the apartment on the night of November 11, 2010. Richardson informed Muleya that Tucker called and would stop by later. At that time, Woolfork was asleep in a bedroom, the victim was drunk and asleep on the couch in the living room, and Richardson was asleep on a mattress in the living room. Richardson let Tucker and an "unidentified black male" into the apartment. Tucker came to the bedroom where Muleya and Woolfork were, pointed his gun at Muleya, and said, "Where is the money?" Muleya went to the living room and woke up the victim. The "unidentified

5

black male" pointed his gun at the victim. Muleya then started fighting with Tucker over the gun. Tucker pointed the gun at Muleya and the gun clicked but did not fire. Tucker struck Muleya on the head with the handgun. Muleya heard one gunshot from the living room, where the victim and the "unidentified black male" were fighting. Muleya then found the victim lying in the hallway bleeding from his chest. Tucker and the "unidentified black male" fled out of the apartment. Muleya identified Tucker in a photo lineup but did not identify the second black male.

¶ 15    According to the statement of Veronica Woolfork, on November 11, 2010, she was in the apartment with Muleya, Richardson, and the victim. Tucker called and said he might come by the apartment later. Richardson let Tucker into the apartment when he arrived. Woolfork observed Tucker and "another black male she did not know" with handguns. Woolfork and Richardson retreated to the master bedroom and closed the door. Tucker pushed the bedroom door slightly ajar, pointed the handgun at Woolfork, yelling, "Where is the money, bitch?" She told him she had no money. Muleya and Tucker started to physically fight. Woolfork witnessed Tucker hit Muleya on the head with the handgun, causing Muleya to bleed. Woolfork also witnessed the victim and the other gunman fighting near the main entrance to the apartment. She then heard one gunshot and saw the victim lying in the outside entranceway between the two upstairs apartments. She saw blood on the outside door to the adjacent apartment and blood from a chest wound on the victim. Tucker and the other gunman fled, and Woolfork called 9-1-1.

¶ 16    According to the stipulated testimony of Dr. John Heidingsfelder, an expert forensic scientist who performed the autopsy of the victim, he observed a gunshot wound to the front of the victim's chest, which created a hole in the victim's heart. In his opinion, the victim suffered a contact wound, which meant the barrel touched the skin of the victim when the handgun fired. Dr. Heidingsfelder recovered one bullet from the victim during the autopsy. Alcohol and cannabis

6

were detected in the victim's system. Dr. Heidingsfelder determined the cause of death was lacerations of the heart and lungs due to a gunshot wound to the chest and that the manner of death was homicide.

¶ 17    According to the stipulated testimonies of Detectives Graul and Stefan, the detectives conducted an interview of defendant at the East St. Louis Police Department. The detectives read defendant his *Miranda* rights, which defendant signed and indicated his understanding. Defendant then recounted his version of the events that took place on November 11, 2010. Defendant rode with Hampton, Tucker, and Moore to Carbondale. They drove to an apartment, where Hampton retrieved two handguns. Tucker and Hampton talked about wanting to "hit a lick," which defendant described as committing a robbery. Hampton gave defendant a "loaded silver chrome snub nose .38 caliber revolver" and Tucker the other gun. After arriving at Muleya's apartment, defendant and Tucker approached the apartment, while Hampton and Moore stayed in the car. After entering the apartment, Tucker walked back to a bedroom and defendant sat down on the couch. Defendant then walked back to the bedroom and observed Tucker pointing his gun at a male and a female lying in bed. Tucker instructed the male to get up and then walked him into the living room. The man tried to wake up a male that fell asleep on the couch saying, " 'Dude, wake up. Tucker wants the money. Dude, wake up. Tucker wants the money, and he has got a gun.' " Defendant stood by the front door and Tucker went into the front bedroom with the two girls and shut the door. Defendant knocked on the door and called for Tucker to leave. Then, "the big guy," the victim, rushed towards defendant. Defendant ran and turned back to see Tucker smacking a male on the head with his handgun and attempting to pull the trigger, but the gun failed to fire. The victim then grabbed defendant and pulled him over the couch and onto the floor. Defendant fell on his back with the victim on top of him. They both had their hands on the gun; however, defendant pulled

7

the trigger, and the victim leapt off defendant and walked out the door. The victim knocked on the adjacent apartment's door. Defendant witnessed "blood squirting from the guy's chest" and soon the victim fell back on the ground. Tucker and defendant returned to the car and the four men drove back to East St. Louis. Hampton instructed defendant to get rid of the gun, so defendant tossed the gun in the Mississippi River.

¶ 18    Defense counsel stipulated to the State's evidence. The trial court, considering the stipulated evidence, determined that the State proved beyond a reasonable doubt the charge of first degree murder. The court found defendant guilty and entered a judgment of conviction. At a hearing on April 12, 2013, the court denied defendant's motion for a new trial and sentenced defendant to 50 years in prison.

¶ 19    Defendant timely appealed, arguing that the trial court erred by not suppressing defendant's confession. On February 23, 2016, this court affirmed the trial court's decision and found the trial court properly admitted the third interview. *People v. Stanley*, 2016 IL App (5th) 130258-U.

¶ 20    On September 15, 2016, defendant filed a *pro se* postconviction petition, alleging ineffective assistance of trial and appellate counsel, that the detectives violated his *Miranda* rights, and that police coerced him with lies to make a false confession. Defendant claimed Detective Ward told him if he was honest with Detectives Graul and Stefan then "I will make sure you get out of this. But this has to stay between us, you can't say nothing. Just trust me." Defendant alleged that he told trial counsel, but trial counsel said there was no proof and the court would not believe defendant over a police officer. Additionally, defendant included a claim of actual innocence and attached an affidavit from Tucker. In the affidavit, Tucker claimed that he shot the victim. Tucker stated that he told defendant to confess to shooting the victim, but Tucker wanted to "come clean on what really happened."

8

¶ 21 The trial court advanced the petition to the second stage and appointed postconviction counsel. On May 17, 2022, counsel filed an amended petition, alleging claims of ineffective assistance of trial and appellate counsel and actual innocence. Counsel attached an affidavit of defendant asserting his innocence and the truthfulness of his statements concerning trial counsel and Detective Ward. Counsel also attached a May 2013 federal indictment against Detective Ward, and a judgment showing Detective Ward pled guilty to conspiracy to distribute and possession with intent to distribute cocaine. Additionally, counsel attached the affidavits of Tucker and Terril Williams, Tucker's neighbor in 2014, in which Williams stated that Tucker asked him if it was "wrong to let another person do time for something they didn't do." Williams also stated that Tucker said he wanted to "come clean" and told Williams he invited defendant to "see some girl," but when they entered the apartment, Tucker pulled a gun and demanded money. Tucker then told Williams that "the victim rushed [defendant] to the ground" and Tucker "came and pulled the victim off of [defendant] and shot the victim in the chest and then threaten[ed] [defendant] to say it was him who shot the victim."

¶ 22 On June 10, 2022, the State filed a motion to dismiss and a memorandum of law. The State noted that the trial court suppressed three of the four interviews, and that defendant's trial was a stipulated bench trial with no in-person, live testimony. The stipulated evidence included defendant's statement, four eyewitness accounts, and testimony about the victim's autopsy. The State further noted that Tucker's conviction for felony murder was overturned on appeal in 2015, and he pled guilty to home invasion, with the murder charge dismissed. One month later, Tucker signed the affidavit attached to defendant's postconviction petition. The State argued that, if defendant had an agreement with Detective Ward as defendant alleges, then he received the benefit of the bargain when he was not charged with the East St. Louis murder. Therefore, the State argued

9

that defendant suffered no prejudice for trial counsel's failure to bring Detective Ward's statement before the court, as the results would not have changed. The State also argued that trial counsel did not render ineffective assistance for failing to bring Detective Ward's criminal conduct before the court, given defendant's trial took place on February 15, 2013, and Detective Ward was not indicted until May 9, 2013. The State further argued that appellate counsel did not render ineffective assistance, given trial counsel did not render ineffective assistance.

¶ 23   Regarding defendant's actual innocence claim, the State argued that, while newly discovered and noncumulative evidence, the affidavits of Tucker and Williams were not conclusive such that the result of the trial would change. Specifically, the State argued that the evidence undisputedly showed defendant present in the apartment when the victim was shot. In addition, four witnesses saw defendant, not Tucker, fighting with the victim when the gun fired. Moore's statement indicated that defendant, upon returning to the car, exclaimed, "I think I shot a dude, and he wasn't moving. I shot him in the chest." The State also pointed to defendant's confession and argued that the result would not change in light of the new evidence.

¶ 24   On August 1, 2022, the trial court dismissed defendant's actual innocence claim in a written order. The court found that the record contradicted defendant's "new story." Originally, defendant said that he knew about the robbery when he entered the apartment armed with a handgun, which witness testimonies corroborated. In defendant's "new story," the court noted that defendant neither had a gun on him nor knew about the robbery. The court found that, although the affidavits may be new, they were not conclusive enough to change the result of the trial. The court advanced the claim of ineffective assistance of counsel to the third stage for an evidentiary hearing.

¶ 25   On January 27, 2023, the trial court held a hearing on defendant's claim of ineffective assistance of trial counsel. At the hearing, defendant testified that he told his trial counsel about

10

the statements Detective Ward made to defendant, but that trial counsel failed to argue the statements during the motion to suppress hearing. Defendant acknowledged that the statements made by Detective Ward occurred before Detective Ward was federally indicted. Defendant testified that he told appellate counsel about his ineffective assistance allegations; however, appellate counsel failed to assert his allegations on appeal. When asked to recount what Detective Ward said to him, defendant stated, "Basically, if you tell me what's going on, I won't charge you with these murders, what I got to keep between me and him." On cross-examination, defendant acknowledged that he was not charged with the East St. Louis murder. Defendant testified that Detective Ward's alleged promises of leniency took place outside of the interview room with no recording. Defendant conceded that trial counsel could not have known about Detective Ward's crimes at the time of defendant's trial. Defendant acknowledged that no statements he made to Detective Ward were used against him at the trial.

¶ 26 The trial court inquired of the attorneys whether defendant's interview with Detective Ward was in evidence. The State responded in the affirmative, noting that the court previously suppressed this interview following the motion to suppress hearing. The trial court wanted to review the recorded interview before reaching a decision.

¶ 27 On February 17, 2023, the trial court entered a written order dismissing defendant's postconviction petition. The court indicated that the "sole issue is whether the statements of leniency made by Detective Ward overcame the will of [defendant] when he made his confession. If so, the use of the confession would be problematic." The court found that defendant failed to meet his burden of proof because the "only evidence the [c]ourt has is that a statement offering leniency was made. No facts or circumstances surrounding the confession is offered." The court further found that defendant "admits the statement was not even used and even if there was some

11

evidence that the will of [defendant] was overcome, there is no constitutional violation at trial because the statement was not used." Defendant timely filed notice of appeal.

¶ 28                                    II. Analysis

¶ 29     On appeal, defendant requests this court reverse the trial court's dismissal of his postconviction petition and remand for a new hearing on defendant's motion to suppress. If granted, he requests this court grant him a new trial pursuant to his allegations of ineffective assistance, or for a third stage postconviction hearing pursuant to his actual innocence claim.

¶ 30     The Act provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated in his original trial or sentencing hearing. 725 ILCS 5/122-1 *et seq*. (West 2020); *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). The Act provides a three-stage process for the adjudication of postconviction petitions. *People v. English*, 2013 IL 112890, ¶ 23. At the first stage, the trial court independently assesses the defendant's petition, and if the court determines that the petition is "frivolous" or "patently without merit," the court can summarily dismiss it. 725 ILCS 5/122-2.1(a)(2) (West 2020); *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). To survive the first stage, "a petition need only present the gist of a constitutional claim." *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996).

¶ 31     If a petition is not dismissed at the first stage, it advances to the second stage where an indigent petitioner can obtain appointed counsel, and the State can move to dismiss it. 725 ILCS 5/122-2.1(b), 122-4, 122-5 (West 2020); *Edwards*, 197 Ill. 2d at 245-46. At the second stage, if the defendant makes a substantial showing of a constitutional violation, the petition advances to the third stage where the trial court conducts an evidentiary hearing on the merits. 725 ILCS 5/122-6 (West 2020); *Edwards*, 197 Ill. 2d at 246. At a third stage postconviction hearing, the burden of proof is upon the defendant to show a denial of a constitutional right by a preponderance of the

evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92. Where a trial court makes credibility determinations, those determinations are reviewed for manifest error. *English*, 2013 IL 112890, ¶ 23. A trial court's ruling is manifestly erroneous if the error is clearly plain, evident, and indisputable. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

¶ 32    First, defendant argues the trial court erred in dismissing his third stage postconviction petition alleging ineffective assistance of counsel, where defendant testified that Detective Ward made an off-camera promise of leniency if defendant confessed, and the trial court based its finding on a misapprehension that defendant's statement was not used against him at trial. Defendant argues that the court would have suppressed defendant's confession in the third interview if trial counsel presented evidence of Detective Ward's statement. Defendant claims his confession was essential to his conviction and therefore prejudiced him when trial counsel failed to present evidence of the off-camera promise. The State argues that this claim is barred by *res judicata* and forfeiture because defendant challenged the admission of his confession on direct appeal (*Stanley*, 2016 IL App (5th) 130258-U) and should have raised the ineffective assistance of counsel claim on direct appeal. We do not find that defendant is barred from raising this claim because his ineffective assistance claim relies on facts outside the trial record, namely the alleged promise made by Detective Ward, and therefore is not precluded. See *People v. Veach*, 2017 IL 120649, ¶ 47 ("Procedural default does not, however, preclude a defendant from raising an issue on collateral review that depended upon facts not found in the record."). We now turn to the merits of defendant's ineffective assistance claim.

¶ 33    "In order to succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness (deficiency prong) and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings

13

would have been different (prejudice prong)." *People v. Boyd*, 2018 IL App (5th) 140556, ¶ 16 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). "Both prongs under *Strickland* must be satisfied in order to succeed on a claim of ineffective assistance, and the failure to satisfy either prong will be fatal to the claim." *Id.* ¶ 19 (citing *People v. Mack*, 2016 IL App (5th) 130294, ¶ 27). If a case may be disposed on the ground of lack of sufficient prejudice, that course should be taken, and the court need not consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697.

¶ 34   After a thorough review of the record, it is apparent that the trial court believed defendant's confession in his third interview was not used against him. In its order dismissing the postconviction petition, the court concluded that "even if there was some evidence that the will of [defendant] was overcome, there is no constitutional violation at trial because the statement was not used." While it is true that defendant's statements to Detective Ward in the first, second, and fourth interviews were suppressed, defendant alleges on appeal that Detective Ward's off-camera promise of leniency induced defendant's statements to Detectives Graul and Stefan in the third interview, which the court did not suppress but admitted by stipulation at defendant's trial. Defendant, therefore, contends that trial counsel's failure to introduce evidence of this off-camera promise prejudiced him because the court would have suppressed the third interview preventing his confession's admittance at trial.

¶ 35   However, even assuming that defense counsel's representation fell below an objective standard of reasonableness, we cannot conclude that defendant suffered prejudice, amounting to ineffective assistance of counsel. Though defendant claims "his confession was crucial evidence at trial," the stipulated testimonies of eyewitnesses support defendant's guilt. Moore's statement places defendant with Tucker, Moore, and Hampton. Moore would have testified that defendant

14

and Tucker went into the apartment armed with firearms. Moore also would have testified that when Tucker and defendant returned to the car, defendant exclaimed, "I think I shot a dude, and he wasn't moving. I shot him in the chest." Muleya's statement indicated that he fought with Tucker, while defendant fought with the victim. During Muleya's struggle with Tucker, he heard a gunshot. Woolfork's statement indicated that Muleya and Tucker were fighting when the gunshot went off. Woolfork then observed the victim lying and bleeding in the entrance between the apartments. Dr. Heidingsfelder's statement indicated that the victim died from a contact gunshot wound to the chest, with the manner of death ruled a homicide. Ultimately, the stipulated testimonies established defendant inside the apartment, armed with a gun, and fighting with the victim when a gun fired off before he fled to the car and exclaimed that he shot someone. Therefore, trial counsel did not render ineffective assistance for failing to introduce evidence of Detective Ward's alleged promise of leniency, where the evidence, excluding defendant's own confession, established his guilt. Because defendant cannot demonstrate sufficient prejudice from counsel's failure to present evidence of the alleged promise of leniency, we affirm the trial court's dismissal of defendant's third stage postconviction claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 36     Second, defendant contends that the trial court erred when it dismissed his second stage postconviction petition, arguing that he made a substantial showing of actual innocence. Specifically, he asserts that he presented newly discovered evidence of the affidavits of Tucker and Williams, stating defendant was unaware of the planned robbery and did not shoot the victim. As such, defendant argues that the affidavits are of such a conclusive character as to undermine confidence in the finding of guilty. We cannot agree.

15

¶ 37    The dismissal of a postconviction petition without an evidentiary hearing is reviewed *de novo*. *People v. Sanders*, 2016 IL 118123, ¶ 31. A reviewing court will make its own independent assessment of the allegations and supporting documentation. *Id.* The applicable standard at the second stage of postconviction proceedings is that all well-pleaded allegations of the petition and accompanying affidavits are taken as true unless positively rebutted by the record of proceedings. *Id.* ¶ 42.

¶ 38    To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and noncumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. Evidence is of a conclusive character when it, considered along with the trial evidence, would probably lead to a different result. *Id.* As noted by the parties, the standard for conclusive character is not "total vindication or exoneration," but rather requires only that the petitioner "present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 56 (citing *Coleman*, 2013 IL 113307, ¶ 97).

¶ 39    Here, the issue is not whether the affidavits of Tucker and Williams are new, or material and noncumulative, but only whether the affidavits are of a conclusive character so as to support a colorable claim of actual innocence. Defendant argues that the trial court erred because it found that "[defendant] failed to make a substantial showing of actual innocence because the information in the petition contradicted the evidence at trial." Defendant further argues that the court made improper credibility determinations and misapprehended the facts when it stated that the eyewitnesses "testified in trial" and "testified under oath and stayed consistent, unlike the evolving story coming from [defendant], Tucker and Williams." The State rebuts that the trial court properly

16

found the affidavits not of a conclusive character, where the record contradicts the affidavits. We agree with the State.

¶ 40    The trial court dismissed defendant's claim of actual innocence in a written order, stating the following:

> "Tucker and Williams statements are corroborated by one another, but contradictory to eyewitness[es] from trial. Tucker's statement contradicts what both he and [defendant] had said earlier[.] Here, the record directly contradicts the new story put forth by [defendant], Tucker, and Williams.
>
> Originally, [defendant] stated he went in with a gun knowing about the robbery, in his most recent account, he neither had a gun on him, nor knew about the robbery.
>
> The eyewitness[es] who testified in trial stated they saw both Tucker and [defendant] come in the apartment with guns. Although testimony from Tucker and Williams is new, the affidavits are not conclusive enough to indicate the result of the trial would probably change. Further, the eyewitness[es] testified under oath and stayed consistent, unlike the evolving story from [defendant], Tucker and Williams."

¶ 41    While true that the eyewitnesses did not provide live, in-person testimony at trial, they did provide statements stipulated to by both parties at defendant's bench trial. The trial court's misstatement does not change the fact that it conducted a review of the record and found the record positively rebutted the new affidavits and rendered them inconclusive. Defendant contends that the court found the new evidence merely contradicted the stipulated statements of defendant and Tucker. We disagree. Despite the trial court's use of the word "contradicts," the court provided reasoning from the record demonstrating how the record rebutted the affidavits and directed attention to the collective statements of all the eyewitnesses, which showed defendant inside the apartment, with a gun, fighting with the victim, when the eyewitnesses heard the gunshot. *Robinson*, 2020 IL 123849, ¶ 60 (A finding of mere contradiction would be error because "recognizing the existence of a conflict with the trial evidence is not the same as finding that the

17

new evidence is positively rebutted. For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence ***.").

¶ 42    As the dismissal of a postconviction petition without an evidentiary hearing is reviewed *de novo*, we have conducted our own review of the allegations and supporting documentation and conclude that the new affidavits are positively rebutted by the record and therefore not of a conclusive character to support a colorable claim of actual innocence warranting an evidentiary hearing. See *Sanders*, 2016 IL 118123, ¶ 31. In his affidavit, Tucker claims he, Hampton, and Moore discussed the robbery *before* the men picked up defendant. Tucker claims that after he pulled a gun out, a struggle between defendant and the victim ensued and Tucker rushed over and pulled the victim off defendant, firing his handgun into the victim's chest. He claims he told defendant to take the blame. In his affidavit, Williams claims that Tucker confessed this story to him because he did not want someone "doing time for a crime they didn't commit."

¶ 43    As outlined above, the stipulated trial evidence placed defendant in the apartment, with knowledge of the robbery plans, armed with a handgun, and wrestling with the victim when the gun fired. Moore stated that Hampton and Tucker discussed "hitting a lick" with defendant present in the car. Hampton provided handguns to Tucker and defendant. Moore would have testified that defendant and Tucker left the car and entered the apartment. When defendant returned to the car, he exclaimed that he thought he shot someone, and the person was not moving. Muleya stated that he and Tucker were fighting, and defendant and the victim were fighting when the gunshot was heard. Woolfork observed defendant, not Tucker, fighting with the victim when the gunshot was heard.

¶ 44    This evidence is not mere contradiction, but a record that positively rebuts the new evidence. *Robinson*, 2020 IL 123849, ¶ 60. As such, we affirm the trial court's second stage

18

dismissal of defendant's postconviction petition where the new evidence is not of a conclusive character as to undermine the court's confidence in the judgment of guilt. *Id.* ¶ 56 (citing *Coleman*, 2013 IL 113307, ¶ 97).

¶ 45                                      III. Conclusion

¶ 46    For the reasons stated, we affirm the trial court's dismissal of defendant's postconviction petition.


¶ 47    Affirmed.